MARK B. CHASSMAN (CA Bar No. 119619)
mchassman@chassmanseelig.com
CHASSMAN & SEELIG LLP
11766 Wilshire Boulevard, Suite 270
Los Angeles, CA 90025
Telephone: (310) 929-7192
Fax: (310) 929-7627

SARAH A. PFEIFFER (CA Bar No. 278205)
sap@msf-law.com
SETH H. OSTROW (*pro hac vice*)
sho@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff Sales Transaction Systems, LLC.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALES TRANSACTION SYSTEMS, LLC, | Case No. 4:18-cv-6862-YGR |
| Plaintiff, | **PLAINTIFF SALES TRANSACTION SYSTEMS, LLC'S OPENING CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| POYNT CO., | Hearing Date: December 11, 2019 |
| Defendant. | Time: 2:00 pm |
| | Courtroom: 1, 4th Floor |
| | Date Complaint Filed: Nov. 13, 2018 |
| | Trial Date: Not Set |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

    A.  Procedural History...........................................................................................2

    B.  The '893 Patent...............................................................................................2

    C.  The '893 Patent Prosecution History.............................................................4

III.    CLAIM CONSTRUCTION LEGAL STANDARDS .....................................................7

    D.  Person of Ordinary Skill in the Art.................................................................9

IV.    STS'S PROPOSED CONSTRUCTION OF DISPUTED TERMS.....................................9

    A.  "customer identifier". .....................................................................................9

    B.  "input of bankcard data from a customer with a customer identifier" .............................11

    C.  "customer bankcard data"...............................................................................13

    D.  "a cellular wireless communication network" / "the wireless communication network". 13

    E.  "wirelessly transmits . . .".............................................................................16

    F.  "gateway ........................................................................................................17

    G.  "card authorization network". ........................................................................19

    H.  "remote payment system".................................................................................19

    I.  "the remote payment system verifies the contents of the payment authorization request record" / "verifying by the remote payment system the contents of the payment authorization request record" .............................................................21

    J.  "retail establishment" ....................................................................................22

V.     CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ............................................................................... 13

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) ................................................................................. 18

*Avid Tech., Inc. v. Harmonic, Inc.*,
812 F.3d 1040 (Fed. Cir. 2016) ............................................................................... 15

*Bayer AG v. Biovail Corp.*,
279 F.3d 1340 (Fed. Cir. 2002) ............................................................................... 14

*Bd. of Trustees of Leland Stanford Junior Univ.*,
528 F. Supp. 2d 967 (N.D. Cal. 2007)...................................................................... 21

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) ................................................................................. 8

*Encap LLC v. Oldcastle Retail, Inc.*,
No. 11-C-808, 2012 WL 2339095, at *9 (E.D. Wis. June 19, 2012) ........................ 18

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
No. 13-CV-05038 NC, 2015 WL 1062676, at *7 (N.D. Cal. Mar. 11, 2015).......................... 19

*Finjan, Inc. v. Bitdefender Inc.*,
No. 17-CV-04790-HSG, 2019 WL 634985, at *5 (N.D. Cal. Feb. 14, 2019)........................... 20

*Gamevice, Inc. v. Nintendo Co.*,
No. 18-CV-01942-RS, 2019 WL 3536986, at *6 (N.D. Cal. Aug. 2, 2019)............................ 20

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004) ............................................................................... 15

*Humanscale Corp. v. CompX Int'l Inc.*,
No. 3:09-CV-86, 2010 WL 3222411, at *3 (E.D. Va. Aug. 16, 2010) ...................... 19

*IMS Technology, Inc. v. Haas Automation, Inc.*,
206 F.3d 1422 (Fed Cir. 2000) ................................................................................ 16

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ................................................................................. 8

*K–2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999) ............................................................................... 16

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
790 F.3d 1298 (Fed. Cir. 2015) ................................................................................. 9

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) ................................................................................. 8

*Lemelson v. Gen. Mills, Inc.*,
968 F.2d 1202 (Fed. Cir. 1992) ................................................................................. 9

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009) ............................................................................... 15

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ........................................................................................... 7, 21

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017) ................................................................................ 11

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) .................................................................................. 1

*Multiform Desiccants, Inc. v. Medzam*, Ltd.,
    133 F.3d 1473 (Fed. Cir. 1998) .................................................................................. 8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .................................................................................. 7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... passim

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) .................................................................................. 8

*Retractable Tech., Inc. v. Becton Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ................................................................................ 11

*Spireon, Inc. v. CallPass Tech, LLC*,
    No. C 12-01903, 2013 WL 706867, at *8 (N.D. Cal. Feb. 26, 2013) ................................ 17, 18

*Stanacard, LLC v. Rebtel Networks*,
    *AB*, 680 F. Supp. 2d 483 (S.D.N.Y. 2010) ................................................................... 21

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
    329 F.3d 823 (Fed. Cir. 2003) .................................................................................. 16

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
    726 F.3d 1306 (Fed.Cir.2013) .................................................................................. 16

*Teleflex, Inc. v. Ficosa No. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ................................................................................ 22

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    135 S.Ct. 831, 574 U.S. 318 (2015) ......................................................................... 7, 8

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
    595 F.3d 1340 (Fed. Cir. 2010) ........................................................................... 17, 18

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................................................ 19

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................................. 8, 13

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ................................................................................ 20

*Zeroclick, LLC v. Apple Inc.*,
    891 F.3d 1003, *1007-8 (Fed. Cir. 2018) ..................................................................... 20

## STATUTES

35 U.S.C. § 112(6) ................................................................................................... 19

35 U.S.C. §101 .......................................................................................................... 2

Plaintiff Sales Transaction Systems, LLC ("STS") hereby submits its Opening Claim Construction brief regarding the proper construction of terms in U.S. Patent No. 9,684,893 (the "'893 Patent", Ex. A[1]) proposed for construction by STS and Defendant Poynt Co.'s ("Defendant" or "Poynt").

## I.      INTRODUCTION

The '893 Patent relates to secure payment transactions.  In particular, as payment methods have become increasingly technological—moving from cash, to checks, to credit cards, to "tap and pay" systems—the inherent risks of conducting such transactions have also increased.  For example, when using credit cards there is a concern that a merchant may retain a customer's private data and use it fraudulently, or that a hacker could access that retained data to use it fraudulently. The '893 Patent proposes a solution to this—using anonymized data when interacting with the merchant's point-of-sales ("POS") terminal so that the merchant or hacker cannot misuse the data. All the fraudster would obtain is anonymized data, but the payment system can use this data to interact with the standard financial systems already in place.  This is achieved using a "customer identifier"—a term that is consistently described as using anonymized, rather than personal, information to interact with the merchant POS terminal.

The '893 Patent specification repeatedly explains that the "customer identifier" and the other claim phrases that refer to the "customer identifier" and customer data must be anonymized. This consistency reflects that anonymity is the crux of the invention.  The Federal Circuit has provided that it is "entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005).  For most other terms, however, the '893 Patent uses straightforward language to describe the device and method claimed in the independent claims, largely because the system is designed to work within existing payment systems.  Thus, there are very few other instances where it is necessary to engage in claim construction.  For most terms that Defendant proposes, doing so would serve only to confuse the jury.  There are a limited number of terms, primarily relating to the "customer identifier" and the need for anonymized data, where

---

[1] All exhibits are attached to the concurrently filed Declaration of Sarah Pfeiffer ("Pfeiffer Decl.").

construction will help the jury when it ultimately becomes their job to evaluate infringement and validity. STS's proposed constructions capture the language in the claims, intrinsic record, and the goals described in the '893 Patent and are therefore proper.

Defendant's claim construction proposals, however, reflect transparent attempts at strained non-infringement positions, without consideration of the standard canons of claim construction. Defendant proposes a number of terms that are readily understood—not just by one of ordinary skill in the art, but by a lay juror—wasting judicial resources. For the few disputed terms where construction would be helpful to the jury (and also mandated by the specification), Defendant's proposed constructions ignore the main sources for claim construction: the context of the claims, the specification, and the file history.

Accordingly, STS respectfully requests the Court adopt its proposed constructions for the disputed terms.

## II.    BACKGROUND

### A.    Procedural History

On November 13, 2018, STS filed the Complaint (D.I. 1), alleging that Defendant infringed, directly and indirectly, the '893 Patent. On April 12, 2019, STS filed the First Amended Complaint. On May 3, 2019, Defendant filed its second Rule 12(b)(6) Motion to Dismiss asserting that all claims of the '893 Patent claims were directed to ineligible subject matter. (D.I. 31.) On June 19, 2019, the Court denied that motion. (D.I. 42.)

On August 23, 2019, the parties filed the joint claim construction statement. (D.I. 50.) Claim construction discovery has now closed.

### B.    The '893 Patent

The '893 Patent issued on June 20, 2017. (Ex. A.) The '893 Patent includes eight claims, two of which are independent. STS has asserted six claims against Poynt (claims 1, 2, 4-6, 8). Claim 1 is directed to a mobile POS terminal, and claim 5 is directed to a method of using a mobile point of sales terminal. The '893 Patent identifies and sets out to solve several problems relating to conducting secure transactions using wireless devices. For example, people often carry multiple cards that use magnetic stripes to conduct credit or bank card transactions. ('893 Patent at 1:28-40.)

2

Point of sales terminal devices have changing security issues, and the banking industry cannot always keep up with these challenges. (*Id.*) In particular, people frequently pay with credit and bank cards, but standard transactions share the customer's private data, such as card number, name, and/or expiration date with the merchant, which the merchant may store. (*See, e.g., id.* at 1:28-52, 2:12-20.) Further, by transmitting that data wirelessly and storing it electronically, such devices are subject to security risks from hacking and fraud.

The '893 Patent proposes a technological solution to these problems, including a point of sales terminal that uses a customer identifier to anonymously identify the customer's private data, such as bank card data, but does not itself include such private data. (*See, e.g., id.* at 7:29-31.) This prevents the customer's private data from being shared with merchants, but still allows card transactions to take place using the traditional financial structure. (*Id.* at 1:49-50.) The customer identifier can be used with mobile and portable point of sales terminals that wirelessly transmit data to complete financial transactions. This improves flexibility for customers and merchants while protecting customers from exposing their private data.

The '893 Patent includes two independent claims, which contain similar limitations. Claim 1 is directed to the physical apparatus itself, while claim 5 is directed to a method of using that device. Claim 1 is shown below.

1. A merchant point of sale (POS) transaction terminal, for acceptance of bankcard payment pursuant to a sales transaction, comprising:

    a. the merchant POS transaction terminal is a mobile and portable wireless device with a built-in interface to a cellular wireless communication network that communicates wirelessly via the wireless communication network to a remote payment system;

    b. the merchant POS transaction terminal receives input of a merchant identifier that identifies the merchant to the remote payment system, and wherein the merchant identifier identifies a retail establishment, and generates transaction specific data such as a transaction reference number, date and time, and a payment amount;

    c. the merchant POS transaction terminal receives and accepts input of bankcard data from a customer with a customer identifier, for a payment by the bankcard for a sales transaction and assembles a payment authorization request record with the merchant identifier, the transaction specific data and the customer bankcard data and wirelessly transmits the payment authorization request record from the merchant POS transaction

1

terminal for the payment for the sales transaction to the remote payment system for forwarding via a gateway to a card authorization network; and

2

3

d.   the merchant POS transaction terminal then wirelessly receives from the remote payment system a payment approval record for the sales transaction.

4

Claim 5 is directed to a method of using the merchant POS terminal.  Dependent claims 2

5

and 6 relate to further verification requirements, claims 3 and 7 relate to a keypad limitation on the

6

physical device (and are not asserted against Defendant), and claims 4 and 8 relate to including a

7

further physical device, a printer for printing sales receipts.

8

### C.   The '893 Patent Prosecution History

9

On March 27, 2013, the '893 Patent was filed as Application No. 13/851,909 ("'909 App.").

10

(Ex. A at 1.)  The '893 Patent claims priority to various applications, with the earliest claimed priority

11

date being June 30, 2000, based on provisional application No. 60/215,261.  (*Id.* at 1-2.)  A complete

12

copy of the prosecution history for the '893 Patent is attached as Exhibit B.  The '893 Patent

13

underwent an extensive examination, involving many rejections, appeal briefs, and requests for

14

continuation.   The examiner considered numerous prior art references, post-*Alice* Section 101

15

rejections, and Section 112 rejections.  As detailed below, the '893 Patent claims were allowed only

16

after intense scrutiny, overcoming all of these rejections.  Citations will be made to the last three

17

digits in the Bates numbers in the lower right portion of each page.

18

On September 30, 2013, the examiner issued the first Office action ("OA") rejecting the

19

twelve pending claims under Section 103.  (Ex. B at 460-465.)  On December 30, 2013, the applicant

20

responded to the rejections by amending the independent claims 1 and 7 to include a "built-in

21

interface to a cellular wireless communication network".  (*Id.* at 451-452.)  The applicant stated that

22

the prior art did not teach "a wireless sales terminal" and that the prior art required a connection

23

between the sales terminal via an adapter to a wireless modem", thus requiring "external wireless

24

interface hardware elements".  (*Id.* at 454.)  On February 14, 2014, the examiner issued a second

25

OA, again rejecting all claims under Section 103 using a different combination, including one

26

reference assigned to the applicant (Singhal).  (*Id.* at 435-440.)  On July 9, 2014, the applicant filed

27

an appeal brief appealing the second OA.  (*Id.* at 399-412.)  This appeal argued that a corrected

28

Application Data Sheet, claiming priority to the cited Singhal reference, would overcome the rejection.[2]  (*Id.* at 407.)

On August 11, 2014, the examiner issued a non-final OA.  (*Id.* at 390-396.)  The rejections were based on Section 101 and a new Section 103 obviousness combination.  (*Id.*)  The examiner admitted that the Meyer reference failed to disclose a gateway, and cited to the Adam reference.  (*Id.* at 394.)  On October 28, 2014, the applicant responded to this OA.  (*Id.* at 377-385.)  The applicant amended independent claims 1 and 7 to include language relating to the ability of the wireless device to receive and accept "input of a bankcard data for a payment by the bankcard pursuant to a sales transaction".  (*Id.* at 378-379.)  In the Remarks section, the applicant noted that "Examiner cites Meyer for a portable movable sales transaction terminal for use in restaurants which does not teach a wireless sales terminal", distinguishing the Meyer device because it would have to later be connected to a dock to interact with the authorization network and was not wireless.  (*Id.* at 381.)  The applicant further explained that Adam was directed to "conducting e-commerce", and that Adam did not disclose "a point of sale terminal, where the customer is present and swipes or uses his bankcard."  (*Id.*)  The applicant explained that "there is no advantage" to using a wireless terminal over "a landline for making a connection" between the POS and the authorization network, and Adam failed to limit the connection to wireless options.  (*Id.* at 8.)

On November 5, 2014, the examiner issued a final OA.  (*Id.* at 361-367.)  The examiner removed the Adam reference and cited to a new reference, Smith, in combination with Meyer for an obviousness rejection (also maintaining the Section 101 rejection).  (*Id.*)  The examiner claimed that Smith taught a gateway for a system "for making purchases at a point-of-sale".  (*Id.* at 365.)  On March 9, 2015, the applicant filed an appeal brief in response.  (*Id.* at 327-354.)  In response to the Section 103 rejections, the applicant again emphasized that Meyer was *portable* but not *wireless* because it required the merchant to connect the terminal to a docking station.  (*Id.* at 344.)  The applicant further argued that Smith was directed to purchases at vending machine, not a place of business.  (*Id.*)  The applicant argued that Smith was concerned with overcoming the need to install a bankcard reader at every single vending machine in operation and connecting directly to a user's

---

[2] The Patent Office ultimately accepted the corrected Application Data Sheet.  (*Id.* at 115-116.)

bank, and not a merchant sales terminal that can interact with the existing payment authorization network.  (*Id.* at 345.)

On May 18, 2015, the examiner withdrew the final rejection and issued another non-final rejection based on Sections 101 and 103. (*Id.* at 307-313.) The examiner withdrew the Meyer-Smith combination and identified two new references, Taylor and Low. (*Id.* at 310.) On August 11, 2015, the applicant responded to the OA.  (*Id.* at 296-303.)  The applicant included the proposed amendment from the appeal brief, and also specified that the sales terminal is capable of receiving input of a merchant id and generating transaction specific data, along with being capable of assembling and sending a payment authorization request.  (*Id.* at 297.)  The applicant argued that Taylor did not disclose "a fully capable wireless point of sales terminal" as claimed.  (*Id.* at 301.) The applicant explained that the Taylor reference did not disclose the payment authorization request or interaction with a card authorization network.  (*Id.*)  The applicant filed a substantively similar supplemental amendment to this response on August 19, 2015.  (*Id.* at 273.)

On September 11, 2015, the examiner issued a final OA.  (*Id.* at 247-254.)  The examiner maintained the Section 101 rejection, but changed the Section 103 combination to a combination of Taylor, Brody, and Duyck.  (*Id.* at 249-250.)  On December 10, 2015, the applicant filed a request for continued examination, amendment, and response.  (*Id.* at 205-217.)  The applicant included an amendment to independent claims 1 and 7 and canceled pending claims 2 and 3.  (*Id.* at 206-207.) This amendment included language that the merchant id "identifies the merchant to the remote payment system" and that the POS terminal receives the input of the bankcard data "with a customer identifier".  (*Id.*)  The applicant again noted that Taylor was not "fully capable" as a merchant sales terminal POS.  (*Id.* at 212-213.)

On December 22, 2015, the examiner issued a non-final rejection based on Sections 101 and 103, with a new combination of references—Taylor, Brody, and Meyer.  (*Id.* at 174-181.)  On March 22, 2016, the applicant submitted an amendment and response.  (*Id.* at 150-170.)  The amendments specified a "merchant POS <u>transaction</u> terminal" and that the merchant identifier would identify "a retail establishment".  (*Id.* at 151-152.)  The applicant distinguished Taylor and Brody similarly to previous arguments.  (*Id.* at 160-164.)  Regarding Meyer, the applicant explained that after the device

in Meyer is moved to a customer table, the data is stored in the terminal, where it must then be placed in a docking station to authorize payment.  (*Id.* at 167-168.)  The applicant explained again that in Meyer, the device must be placed in a docking station and the "merchant computer system is used to complete the payment transaction request".  (*Id.* at 168.)  Thus, Meyer did not teach a wireless terminal with all the claimed limitations.  (*Id.*)

On April 28, 2016, the examiner issued a final rejection based on Sections 101 and 103, with a new combination of references.  (*Id.* at 120-127.)  The examiner now relied on Taylor, Brody, Auseums, and Giordano.  (*Id.*)  On September 26, 2016, the applicant submitted a third appeal brief in response to this final rejection.  (*Id.* at 68-104.)  The applicant did not propose any further amendments.  (*Id.*)  The applicant argued the examiner did not have sufficient grounds to combine the disparate references and repeated the arguments relating to Taylor and Brody.  (*Id.* at 93-99.)  On November 28, 2016, the examiner submitted an examiner's answer to the appeal brief.  (*Id.* at 58-67.)  The examiner withdrew the Section 103 rejections, but maintained the Section 101 rejection.  (*Id.* at 60-61.)  The examiner identified a new rejection under Section 112, alleging the claims were directed to hybrid claims (including both structural and method steps in a single claim).  (*Id.* at 61.)  On February 15, 2017, however, the examiner issued a Notice of Allowability without further communications.  (*Id.* at 34-38.)  The examiner noted that the Section 112 rejection was not valid, and that the Section 101 rejection was not proper in view of evolving case law and PTO guidance.  (*Id.* at 37.)  The examiner further noted that the best prior art did not teach the claim limitations.  (*Id.*)  Thus, the examiner withdrew all rejections, and on June 20, 2017, the '893 Patent issued.

## III.   CLAIM CONSTRUCTION LEGAL STANDARDS

A patent's claims "define[] the scope of the patentee's rights."  *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 835, 574 U.S. 318 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).  "When the parties raise an actual dispute regarding the proper scope" of the asserted claims, it is for the court, not the jury, to resolve.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  "The words of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

7

1576, 1582 (Fed. Cir. 1996)).  That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Id*. at 1313.

To determine the ordinary meaning, the court should review "the same resources as would" the person of ordinary skill in the art.  *Multiform Desiccants, Inc. v. Medzam, Ltd*., 133 F.3d 1473, 1477 (Fed. Cir. 1998).  Those resources include intrinsic evidence, which includes "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  Although claim construction is generally a matter of law, there may be "subsidiary factual findings," such as those based on evidence extrinsic to the patent.  *Teva Pharmaceuticals USA, Inc.*, 135 S.Ct. at 838.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning.  *Id.*  "[P]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation."  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (citations omitted).

"[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  Thus, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  On occasion, "the specification may reveal a special definition given to a claim term . . . that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  "Like the specification, the prosecution history provides

1  evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317

2  (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1992)).

3     Extrinsic evidence such as dictionaries, treatises and expert testimony "can be useful to a

4  court for a variety of purposes, such as to provide background on the technology at issue, to

5  explain how an invention works, to ensure that the court's understanding of the technical aspects of

6  the patent is consistent with that of a person of skill in the art, or to establish that a particular term

7  in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at

8  1318.  But the Federal Circuit has cautioned against over-reliance on extrinsic evidence such as

9  dictionaries where such evidence "is inconsistent with the intrinsic record." *Kaneka Corp. v.*

10  *Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015).

11     **D.**  **Person of Ordinary Skill in the Art**

12     A person of ordinary skill in the art on June 30, 2000, would have a bachelors degree in

13  computer science or an equivalent field along with 1-2 years of relevant experience, or an advanced

14  degree in such fields with relevant research or work in relevant areas.

15  **IV.**  **STS'S PROPOSED CONSTRUCTION OF DISPUTED TERMS**

16     **A.**  **"customer identifier"**

| "customer identifier"  ’893 Patent: claims 1, 5 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| electronic data anonymously identifying a customer for electronic payment processing | any number of characters that can be used to identify and verify the customer for gaining access to and interacting with the remote payment system |

21     The '893 Patent specification uses term "customer identifier" consistently throughout the

22  specification.  The specification "is the single best guide to the meaning of a disputed term" and is

23  "usually dispositive." *Phillips*, 415 F.3d at 1315.  Indeed, the '893 Patent specification is so

24  consistent and clear that it reveals "a special definition given to a claim term". *Phillips*, 415 F.3d

25  at 1316.  STS's proposal captures that special definition, which requires anonymized data.

26     The '893 Patent indisputably provides a special meaning for and purpose of the "customer

27  identifier":

28

9

> Referring to FIGS. 2 and 3A, the payment system **12** can store a customer identifier **320** for each of the customers **20** in the identifier database **38**A. As provided herein, the customer identifier **320** can be used to ***anonymously identify and verify the customer 20*** for gaining access to and interacting with the payment system **12**. The customer identifier **320** enables the customer **20** to interact with and use the payment system **12** ***without revealing private data of the customer***. Stated another way, the customer identifier **320** enables the customer **20** to be ***anonymously identified*** to the payment system **12**.

('893 Patent at 7:20-26 (emphasis added).)  This understanding "most naturally aligns" (*Phillips*, 415 F.3d at 1316) with the goal of the claimed POS terminal— "protecting the privacy and private data of a customer" during transactions.  ('893 Patent at 1:23-24.)  The '893 Patent goes on to explain that the invention "provides a level of security" because the "card number and/or the expiration date of the payment card is not disclosed to the merchant."  (*Id.* at 1:49-52.)  The claimed invention achieves the goal of increased security by including, among other features, the use of a "customer identifier"—rather than personal bankcard information—to assemble a "payment authorization request record.  ('893 Patent, claims 1 and 5.)

The specification confirms that the invention requires that any data necessary to verify the purchase be anonymized.  For example, the '893 Patent describes transforming bankcard data into equivalent data so that it no longer transmits the personal identifiers, which can then be transformed into bankcard data that the payment system uses for processing.  (*Id.* at 9:17-38, 10:1-4.)  The '893 Patent further describes various non-limiting methods of creating customer identifiers (*id.* at 7:31-52) and protecting bankcard data (*id.* at 8:60-9:16).  The specification repeatedly requires that the data be anonymized (emphasis added):

- The system "facilitates the **anonymous** use of one or more bankcards" (2:59-60)

- The system "provides **anonymity** and security to the customer" (2:61-62)

- "[T]he customer identifier 320 can be used to **anonymously** identify and verify the customer 20 for gaining access to and interacting with the payment system 12" (7:23-26)

- The customer is "**anonymously** identified to the payment system 12" (7:30-31)

- The system "can be used to facilitate the **anonymous** use of the other existing bankcards 31 of the customer." (14:9-11)

- "The payment system can store the private data 25 of the customer **anonymously**" (14:11-12)

10

*See also* '893 Patent at Figs. 6A-C (describing using a number, payment card number, at the merchant terminal that is different than the customer's bankcard number so that the merchant terminal does not receive the bankcard number itself but can still process the transaction); 1:18-24, 7:20-64, 10:21-11:15, 12:4-7, 13:4-14, 11:11-29.   These numerous examples demonstrate that the specification reveals "a special definition given to a claim term".  *Phillips*, 415 F.3d at 1316.

In fact, the specification actually uses the same reference number, 320, to refer to the "customer identifier 320" (*see, e.g.,* 4:30-31) and "anonymous identifier 320" (10:32), confirming these are one and the same.  Where the specification consistently describes a term it is appropriate to "tether the claims to what the specifications indicate the inventor actually invented." *Retractable Tech., Inc. v. Becton Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  The proper construction is the one "that 'most naturally aligns with the patent's description of the invention'".  *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) (quoting *Phillips*, 415 F.3d at 1316).

Notwithstanding the overwhelmingly clear description of "customer identifier" as anonymized data, Defendant's construction fails to confirm that the data must be anonymous. Instead, Defendant's construction directly contradicts the specification by stating that the customer identifier "can be used to identify and verify the customer"—as detailed above, the entire purpose is that the customer identifier does not directly identify that customer's private data, but still provides access to the payment system.  Because Defendant's construction leaves open the possibility that the customer identifier could include the customer's private data, it cannot be correct.

Therefore, STS's proposed construction most closely tracks the claim language and specification, along with the purpose of the invention and should be adopted.

**B.    "input of bankcard data from a customer with a customer identifier"**

| "input of bankcard data from a customer with a customer identifier"<br><br>'893 Patent: claims 1, 5 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| input of electronic data anonymously identifying a bank card customer and the | input of data from a customer's charge card, debit card, or check card issued by a bank |

| customer's bank card for electronic payment processing | and/or other institution, or merchant card specific to a merchant, with any number of characters that can be used to identify and verify the customer for gaining access to and interacting with the remote payment system |
| --- | --- |

The discussion regarding "customer identifier" carries equal weight for the longer term, "input of bankcard data from a customer with a customer identifier".  As detailed above, the '893 Patent describes a device and method that "enables the customer 20 to interact with and use the payment system 12 without revealing private data of the customer." ('893 Patent at 7:26-29.)  The specification goes on to explain this: "Stated another way, the customer identifier 320 enables the customer to be anonymously identified to the payment system 12." (*Id.* at 7:29-31.)

This description confirms that the POS terminal receives the input as the customer identifier, not the underlying private data.  The '893 Patent explains that a benefit of the system is that "[t]he customer can conduct a transaction . . . without disclosing the name, address private data and credit card information of the customer 20". ('893 Patent at 14:13-16.)  Thus, the proper construction must make clear that the input is the anonymous data, and not the actual bankcard data.  Such an input would not be secure and would run counter to the purpose of the invention.

The prosecution history further supports that the POS terminal receives the data as anonymized data that can, ultimately, be used to verify the transaction with the authorization system.  On December 10, 2015, the applicant filed a request for continued examination, amendment, and response.  (Ex. B at 205-217.)  This amendment included language explaining that the POS terminal receives the input of the bankcard data "with a customer identifier".  (*Id.*)

In view of the repeated statements throughout the specification that a goal of the '893 Patent is to enable secure transactions, Defendant's proposed construction cannot be correct. Defendant's construction fails to clarify that the input is *with* the customer identifier, not as the actual bankcard data.  The customer identifier (as further discussed above) is what ensures the security of the transaction and prevents the merchant from obtaining the customer's bankcard information.  Any construction of this term that fails to specify the anonymous nature of the data

input fails to comport with the claim language, specification, file history, and the purpose of the invention.

### C.    "customer bankcard data"

| "customer bankcard data" ’893 Patent: claims 1, 5 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| "electronic data anonymously identifying a customer's bank card" | data from a customer's charge card, debit card, or check card issued by a bank and/or other institution, or merchant card specific to a merchant |

The Federal Circuit has confirmed that "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582). It is important to consider "the context of the surrounding words" when evaluating the proper construction of a term. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). Here, context makes clear that this data must also be anonymized.

The POS terminal "receives and accepts input of ***bankcard data from a customer with a customer identifier***, for a payment by the bankcard for a sales transaction and ***assembles a payment authorization request*** record with the merchant identifier, the transaction specific data and ***the customer bankcard data*** and wirelessly transmits the payment authorization request record". (Claim 1.) As described in the previous section, the acceptance of the bankcard data is in the form of the anonymized data, the customer identifier. *See* Section IV.B. This achieves the goal of protecting the customer from disclosing the private data. Thus, for the same reasons that "customer identifier" and "input of bankcard data from a customer with a customer identifier" must include anonymized data, the assembled payment authorization request record must also use anonymized data representing the "customer bankcard data".

### D.    "a cellular wireless communication network" / "the wireless communication network"

| "a cellular wireless communication network" / "the wireless communication network" ’893 Patent: claims 1, 5 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | a cellular telephone network / the cellular telephone network |

1    It is indisputably improper to "read into a claim a limitation from a preferred embodiment,

2    if that limitation is not present in the claim itself." *Bayer AG v. Biovail Corp.*, 279 F.3d 1340,

3    1348 (Fed. Cir. 2002). Here, nothing in the claims, specification, or file history suggests deviating

4    from this standard principle of claim construction.

5    The claim uses the phrase "cellular wireless communication network" in a general manner.

6    As described below, one of ordinary skill in the art would understand that "cellular wireless" refers

7    to the arrangement of the transceivers used for communication, which can be used for WiFi,

8    BlueTooth, or telephonic networks (such as 4G or LTE, for example). The specification refers to

9    wireless networks in a general manner as well, without limitation to any specific wireless network:

10   "a wireless network" ('893 Patent at 6:7); "a wireless data input device" (*id.* at 6:17); "wireless

11   cellular network" (*id.* at 6:44); "using a wireless network" (*id.* at 13:6); "wireless device" (*id.* at

12   13:17).

13   One of ordinary skill in the art would understand that such a general use of the phrase

14   "wireless network" or "cellular wireless network" would not be limited to any particular type of

15   cellular wireless network. The *Encyclopedia of Networking and Telecommunications* (attached as

16   Exhibit C) explains various types of wireless networks, including local area networks (LANs),

17   BlueTooth, personal area networks (PANs), noting that there are two types: fixed and mobile. (Ex.

18   C at p. 1359.) This section specifically refers to "cellular telephone system" (*id.*), indicating the

19   cellular alone is not limited to telephone networks. The *Encyclopedia* explains that wireless

20   communication networks "transmit[] signals through air and space using radio waves." (*Id.* at p.

21   1369.) As the *Encyclopedia* details, "[m]ost wireless networks will have multiple microcells and

22   multiple base stations". (*Id.* at 1374.) Because the signals can only be transmitted over a limited

23   area, multiple transceivers can be used to create "microcells", which can then be placed in a

24   manner to ensure complete coverage. (*Id.* at 1373.) WiFi networks, such as LANs are set up this

25   way, and the mobile cellular phone networks are also set up in this manner. (*Id.*; *id.* at 1378.)

26   Indeed, when speaking of a wireless telephone network, the *Encyclopedia* describes it as a

27   "wireless mobile communications" network, not just a wireless network or wireless cellular

28

---

14

1   network.  (*Id.* at 2332-33.)  Thus, without further explanation that the cellular network is a

2   telephonic or mobile cellular network, there is no reason to limit the claim further.

3          Defendant's construction just adds "telephone" into the phrase—a phrase that a person of

4   ordinary skill the art could readily understand (and would understand to not be limited to mobile

5   telephone networks).  Nothing in the claims refers to a telephone network.  The specification itself

6   only refers to "telephone" in the context of the "telephone number" of a customer ('893 Patent at

7   8:6, 8:24, 11:52) or relating to conducting a payment on a "voice telephone" (*id.* at 12:48-50).

8   Even if the specification did refer to a cellular telephone network, which it does not, limiting the

9   claims to a disclosed embodiment would not be proper without a "clear disavowal" by the

10  applicant.  *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004)

11  ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the

12  patentee is entitled to the full scope of its claim language."); *Linear Tech. Corp. v. Int'l Trade*

13  *Comm'n*, 566 F.3d 1049, 1055 (Fed. Cir. 2009) (refusing to narrow scope of claim language based

14  up on specification).  Because the specification refers to the full range of wireless networks, the

15  scope of the claim must also include the full range of wireless networks.

16         Further, any disavowal of the full scope of the claim language based upon the prosecution

17  history must be "clear and unambiguous".  *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045

18  (Fed. Cir. 2016).  On December 30, 2013, the applicant amended the independent claims (1 and 7)

19  to include a "built-in interface to a cellular wireless communication network".  (Ex. B at 451-452.)

20  The applicant stated that the prior art did not teach "a wireless sales terminal" and that the prior art

21  required a connection between the sales terminal via an adapter to a wireless modem", thus

22  requiring "external wireless interface hardware elements".  (*Id.* at 454.)  Thus, the amendment

23  served to show that the claimed POS terminal was capable of interacting with a wireless network

24  without an adaptor.  The amendment had nothing to do with distinguishing as a mobile telephone

25  network.  Later, the applicant distinguished the Adam reference by noting that it disclosed various

26  communication links, including a landline telephone network or internet connection.  (*Id.* at 383.)

27  The Adam reference only offered one wireless option—a "wireless telephone network" option—

28  among several wired options.  The applicant distinguished the benefit of the invention as being

*wireless*, not on the basis that it was limited to mobile telephone networks.  (*Id.*)  And even when distinguishing the claims, the applicant referred to a "wireless cellular network", not a telephone network.  (*Id.*)  This type of argument is not a clear disavowal of scope, nor is it a position "that would lead a competitor to believe the applicant had disavowed coverage".  *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 834 (Fed. Cir. 2003) (quoting *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1439 (Fed. Cir. 2000)).  The exchange makes clear that the emphasis was on "wireless" not on telephone, underscored by the fact that no amendment to this phrase or other disavowal accompanied this argument.

Nothing in the specification or file history indicates a "clear and unambiguous" intent to limit the claims to only one form of wireless cellular communication networks, and this Court should reject Defendant's attempt to improperly limit the scope of the claims.

### E.    "wirelessly transmits . . ."

| "wirelessly transmits the payment authorization request record from the merchant POS transaction terminal for the payment for the sales transaction to the remote payment system"/"transmitting wirelessly by the merchant POS transaction terminal the payment authorization request record for the payment for the sales transaction to the remote payment system"  '893 Patent: claims 1, 5 | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | wirelessly transmits the payment authorization request record from the merchant POS transaction terminal for the payment for the sales transaction directly to the remote payment system / transmitting wirelessly by the merchant POS transaction terminal the payment authorization request record for the payment for the sales transaction directly to the remote payment system |

Defendant's proposed construction simply repeats the language in the claim with one modification: the construction inserts the word "directly" between "sales transaction" and "to the remote payment system".  "Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1321 (Fed. Cir. 2013) (quoting *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999)).  There is no

basis in the claim language to support a construction that does nothing more than add an unclaimed limitation.

The specification explains that the card authorization network cannot distinguish the transaction request from any other "it *may* receive directly from the gateway", but not that it must receive any transmissions directly.  ('893 Patent at 5:64.)  "When consulting the specification to clarify the meaning of claim terms, courts must not import limitations into the claims from the specification."  *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010).  The specification also describes as "alternative embodiment" in which "the payment transaction data is directly received by the payment system 12".  This language is clear that this is but one possible embodiment.  Other statements throughout the specification confirm that direct receipt is one possible embodiment, but at no time is it a requirement.  ('893 Patent at 13:12-14.)  At best, the insertion of the word directly—which adds no clarity or insight regarding the meaning of the term—represents the improper importation of limitations from the specification or file history. Where a proposed construction does not add clarity to the plain meaning, courts in this District have rejected the request to construe the term.  *See Spireon, Inc. v. CallPass Tech, LLC*, No. C 12-01903, 2013 WL 706867, at *8 (N.D. Cal. Feb. 26, 2013) ("CallPass does not offer sufficient evidence to require the construction of this term and the proposed definition does not add clarity to its plain meaning, the Court again declines to construe the term unnecessarily.")

Defendant's proposal demonstrates that the claim language is perfectly clear—Defendant's transparent attempt to create a non-infringement argument, without any basis in claim construction law, should be rejected.

F.      "gateway"

| "gateway" | |
| --- | --- |
| '893 Patent: claims 1, 5 | |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | a computer system that routes the payment authorization request record to the card authorization network based on a bank routing number |

1    "The task of comprehending [claim language] is not always a difficult one." *Acumed LLC*

2  *v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007).  When considered in the context of the claims

3  and specification, the plain and ordinary meaning of the term "gateway" is readily apparent.  The

4  term in context is clear:

5        wirelessly transmits the payment authorization request record from the merchant
         POS transaction terminal for the payment for the sales transaction to the remote
6        payment system for ***forwarding via a gateway*** to a card authorization network

7  '893 Patent at claim 1.

8    The specification is similarly clear, describing that the payment system "interfaces with a

9  gateway 23, which interfaces with a bank card authorization network".  ('893 Patent at 3:46-47.)

10  While the language of Defendant's proposed construction does appear in the specification (*id.* at

11  3:48-50), mere presence in the specification—with permissive language—is not sufficient to add

12  limitations to a claim.  A comparison of the context of "customer identifier" (*supra*) and the

13  context of "gateway" in the specification demonstrates this.  Unlike the consistent and exclusive

14  description of the "customer identifier" being anonymized, the specification explains that the

15  "gateway" is not limited to that precise definition, stating that the "gateway 23 and network 21 can

16  be similar to existing prior art devices used to process existing bankcards."  (*Id.* at 3:55-57.)  There

17  is no need to further limit the gateway to one that is solely based on a bank routing number, or any

18  other of the superfluous limitations.

19    Defendant's proposal turns a single, easily understood word into a 21-word construction.

20  As above, this wordiness demonstrates that Defendant is attempting to "import limitations into the

21  claims" that are not present and, importantly, not required to understand the term or the claim. *See,*

22  *e.g., Trading Techs. Int'l Inc.*, 595 F.3d at 1352; *see also Spireon, Inc.*, 2013 WL706867 at *8.

23    Defendant's unnecessarily complex construction should be rejected in favor of the plain and

24  ordinary meaning.  *Encap LLC v. Oldcastle Retail, Inc.*, No. 11-C-808, 2012 WL 2339095, at *9

25  (E.D. Wis. June 19, 2012) ("Claim construction is not intended to allow for needless substitution of

26  more complicated language for terms easily understood by a lay jury.").  This Court should reject

27  Defendant's complex construction in favor of the plain meaning.

28

### G.  "card authorization network"

| "card authorization network" | |
|---|---|
| '893 Patent: claims 1, 5 | |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning | one or more computer systems that determine if the bankcard is good to cover the transaction and, if so, authorize the transaction |

As with "gateway", there is no reason to deviate from the plain and ordinary meaning for a simple term like "card authorization network".  "[N]ot all terms in a patent need to be construed by the court."  *Humanscale Corp. v. CompX Int'l Inc.*, No. 3:09-CV-86, 2010 WL 3222411, at *3 (E.D. Va. Aug. 16, 2010).  Where a court determines that "the parties have not identified any dispute or ambiguity" that would require a construction, it need not engage in an "obligatory exercise in redundancy."  *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, No. 13-CV-05038 NC, 2015 WL 1062676, at *7 (N.D. Cal. Mar. 11, 2015) (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).  There is no basis in the claims, specification, or file history for limiting this claim, nor is there any need to waste efforts construing a phrase that is clear.

### H.  "remote payment system"

| "remote payment system" | |
|---|---|
| '893 Patent: claims 1, 5 | |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning.  In the alternative, "a payment system that is remote from the merchant POS transaction terminal" | Subject to 35 U.S.C. § 112(6)<br><br>Claimed Functions:<br><br>(1) using the merchant identifier to identify the merchant as a retail establishment<br><br>(2) forwarding the payment authorization request record, via the gateway, to a card authorization network<br><br>(3) transmitting a payment approval record for the sales transaction to the merchant POS transaction terminal<br><br>With regard to claims 2 and 6, the claimed functions also include:<br><br>(4) verifying the contents of the payment authorization request |

|  | Corresponding Structure: |
|  | As depicted in Fig. 2, a computer system including a processor, operating system, program, and storage device, the storage device including a merchant database and a customer database, the customer database including an identifier sub-database, an identifying sub-database, a bankcard sub-database and a payment card data sub-database. |

As with the preceding terms, "remote payment system" simply does not require construction. The plain meaning is readily understood, and the specification does not narrow or define that plain meaning. But instead of adopting the plain and ordinary meaning of such a simple term, Defendant grasps at straws in attempting to invoke the "means-plus-function" ("MPF") of Section 112, ¶6. Such an attempt must fail.

When a claim term lacks the word "means", a rebuttable presumption arises that Section 112, ¶6 does not apply. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, *1007-8 (Fed. Cir. 2018) (declining to construe as MPF term where defendant offered "no evidentiary support" to carry the burden to overcome presumption) (internal quotations omitted). "[T]he presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Courts regularly reject attempts to invoke Section 112, ¶6, where, as here, the term has "a reasonably well understood meaning in the art". *Gamevice, Inc. v. Nintendo Co.*, No. 18-CV-01942-RS, 2019 WL 3536986, at *6 (N.D. Cal. Aug. 2, 2019) (declining to apply Section 112, ¶6); *see also Finjan, Inc. v. Bitdefender Inc.,* No. 17-CV-04790-HSG, 2019 WL 634985, at *5 (N.D. Cal. Feb. 14, 2019) (same). The term "remote payment system" does not use the word "means," and therefore the presumption against applying Section 112, ¶6 applies. Defendant has offered no evidence to overcome this presumption, nor any evidence that "remote payment system" is not readily understood.

Even if Defendant could demonstrate that this term requires construction, Defendant's construction is needlessly complex. *Stanacard, LLC v. Rebtel Networks, AB*, 680 F. Supp. 2d 483,

493 (S.D.N.Y. 2010) (declining to construe a term where the construction would result in jury confusion).  If any construction is necessary, which it is not, STS's alternative proposal is the better construction because it simply clarifies for the jury what the "payment system" is remote from, without overly complicating the phrase.

This Court should determine that this phrase is not subject to Section 112, ¶6, because Defendant cannot overcome the presumption that the section is not invoked.  Further, the Court should find that the term does not require construction.

**I.     "the remote payment system verifies the contents of the payment authorization request record" / "verifying by the remote payment system the contents of the payment authorization request record"**

| "the remote payment system verifies the contents of the payment authorization request record"/"verifying by the remote payment system the contents of the payment authorization request record" | |
| --- | --- |
| '893 Patent: claims 1, 5 | |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning, incorporating any construction of "remote payment system" adopted by the Court | the remote payment system establishes the truth, accuracy, or reality of at least part of the contents of the payment authorization request record |

The Defendant's proposed construction is, in effect, simply a construction of the word "verifies"—a word that any juror can understand.  As noted above, there is no requirement to construe every term just because a party proposes it.  *Bd. of Trustees of Leland Stanford Junior Univ.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007) (declining to construe a term where "a juror can easily use these terms . . . without further direction from the court").  Construing the word "verifies"/"verifying" would not help the jury or clarify any issues in dispute.

Tellingly, Defendant identified only extrinsic evidence for its proposed construction.  (D.I. 50-1 at A-32.)  Extrinsic evidence, such as dictionaries or other publications, is consulted only if the meaning of the claims is unclear even after reviewing the intrinsic evidence (claims, specification, and file history, in that order).  *Phillips*, 415 F.3d at 1318; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995) (*en banc*), aff'd, 571 U.S. 370 (1996).  There is no need to define the word "verify" for the jury.  The Court should reject this attempt to construe a term that has a readily understandable meaning even to a lay person.

1

### J.    "retail establishment"

| "retail establishment"<br><br>'893 Patent: claims 1, 5 | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| Plain and ordinary meaning.  In the alternative, "location(s) of the merchant where customers who are physically present purchase goods and/or services from the merchant" | a business that sells its own goods (as opposed to goods owned by others), directly to the public, excluding eating establishments |

"[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa No. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  It would be a cardinal sin of claim construction to limit a claim term to anything from the specification or file history without "manifest exclusion or restriction".  *Id.*  No such exclusion exists in this case.

Here, the claim language adds context that the claimed device is a "merchant" POS terminal, indicating it is used by those offering to sell goods or services, as juror would readily understand.  In context, the claim term reads "the merchant identifier identifies a retail establishment", again indicating that it identifies an establishment that sells goods or services.  Nothing in the specification limits the merchant to a particular industry, nor does anything exclude any industries.  As noted above for many of the simple terms that Defendant proposed for construction, this is a term that a lay person juror could readily understand.  Construing the term is a waste of judicial resources and would serve only to confuse the jury.

To the extent construction is required, STS's proposal confirms the purpose of the '893 Patent by clarifying that the merchant ID serves to identify the merchant and that the claimed POS terminal is used by the merchant for in-person transactions (*i.e.,* not for online or e-commerce transactions).

The file history confirms that while the claims are limited to contexts involving in-person interactions with merchants, they are not limited to any particular kind of business.  On December 22, 2015, the examiner issued a non-final obviousness rejection based on Taylor, Brody, and Meyer.  (*Id.* at 174-181.)  Of relevance here, Brody described e-commerce transactions (*id.* at 162)

22

and Meyer described a dock-based payment system used in restaurants (*id.* at 164-167).  On March 22, 2016, the applicant submitted an amendment and response, including a limitation that the merchant identifier would identify "a retail establishment".  (*Id.* at 151-152.)  This helped clarify that the claimed system is used for in-person transactions, not for e-commerce transactions like Brody described.  (*Id.* at 164; *see also id.* at 381 (distinguishing Adam).)  The applicant distinguished Meyer on the basis that it required a docking station and was not truly wireless and portable.  (*Id.* at 167-168.)

These exchanges do not represent a clear disavowal of claim scope as to using a merchant POS terminal in restaurant.  Nothing about the amendment or argument indicates a clear intent to forego transactions in a restaurant environment.  Extrinsic evidence further confirms that "retail establishment" does not exclude restaurant services because an "establishment" simply means a "place of business or residence with its furnishings and staff".  (Ex. D at STS0002319.)

Given the nature of the claims, combined with the general descriptions in the specification and the lack of any explicit disclaimer, the Court should decline to construe this term or adopt STS's proposed construction.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court adopt its proposed constructions for the identified terms.


Dated: October 10, 2019


By:  */s/ Sarah A. Pfeiffer*_____

Sarah A. Pfeiffer
Mark B. Chassman (CA Bar No. 119619)
Email: mchassman@chassmanseelig.com
**CHASSMAN & SEELIG LLP**
11766 Wilshire Boulevard, Suite 270
Los Angeles, CA 90025
Telephone: (310) 929-7192
Fax: (310) 929-7627

Sarah A. Pfeiffer (CA Bar No. 278205)
Email: sap@msf-law.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Seth H. Ostrow (*pro hac vice*)
Email: sho@msf-law.com
**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

STS'S OPENING CLAIM CONSTRUCTION BRIEF, Case No. 4:18-cv-6862-YGR

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on October 10, 2019, I filed the foregoing document with the Court's

3

ECF/CM system, causing it to be emailed to the persons listed below:

4

5

CLEMENT SETH ROBERTS
croberts@orrick.com
JACOB M. HEATH

6

jheath@orrick.com
WILL MELEHANI

7

wmelehani@orrick.com
**ORRICK, HERRINGTON & SUTCLIFFE LLP**

8

The Orrick Building
405 Howard Street

9

San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700

10

Facsimile:      +1 415 773 5759

11

*Attorneys of record for Defendant Poynt Co.*

12

13

MEISTER SEELIG & FEIN LLP

14

15

By:*/s/ Sarah A. Pfeiffer*_____

16

Sarah A. Pfeiffer

17

18

19

20

21

22

23

24

25

26

27

28

STS'S OPENING CLAIM CONSTRUCTION BRIEF, Case No. 4:18-cv-6862-YGR